454 F.2d 941
 147 U.S.App.D.C. 98, Fed. Sec. L. Rep. P 93,236,
1971 Trade Cases P 73,730, 91 P.U.R.3d 266
 CITY OF LAFAYETTE, LOUISIANA, City of Plaquemine, Louisiana,
Petitioners,
v.
SECURITIES AND EXCHANGE COMMISSION, Respondent, Louisiana
Power & Light Company, Intervenor.
CITY OF LAFAYETTE, LOUISIANA, City of Plaquemine, Louisiana,
Petitioners,
v.
FEDERAL POWER COMMISSION, Respondent, Gulf States Utilities
Company, Intervenor.
 Nos. 24764, 24963, 71-1041.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued June 17, 1971.
Decided Oct. 12, 1971.
Petition for Rehearing Denied in No. 71-1041 Dec. 15, 1971.
 
 Mr. Robert C. McDiarmid, Washington, D. C., with whom Mr. George Spiegel, Washington, D. C., was on the brief, for petitioners in Nos. 24,764 and 24,963.
 Mr. George Spiegel, Washington, D. C., with whom Mr. Robert C. McDiarmid, Washington, D. C., was on the brief, for petitioners in No. 71-1041.
 Mr. David Ferber, Solicitor, Securities and Exchange Commission, with whom Mr. Philip A. Loomis, Jr., Gen. Counsel, Securities and Exchange Commission, was on the brief, for respondent in Nos. 24,764 and 24,963. Messrs. Richard E. Nathan, Special Counsel, and Stuart A. Morse, Attys. Securities and Exchange Commission, also entered appearances for respondent in Nos. 24,764 and 24,963.
 Mr. Gordon Gooch, Gen. Counsel, Federal Power Commission, with whom Messrs. J. Richard Tiano, Asst. Solicitor, Federal Power Commission, and Leonard D. Eesley, Asst. Gen. Counsel, Federal Power Commission, were on the brief, for respondent in No. 71-1041.
 Mr. Melvin I. Schwartzman, New Orleans, La., with whom Messrs. Charles A. Read, New York City, and Richard M. Merriman, Washington, D. C., were on the brief, for intervenor in Nos. 24,764 and 24,963. Mr. Charles King Mallory, III, also entered an appearance for intervenor in Nos. 24,764 and 24,963.
 Mr. John E. Holtzinger, Jr., Washington, D. C., with whom Mr. B. H. Hughes, was on the brief, for intervenor in No. 71-1041.
 Before BAZELON, Chief Judge, FAHY, Senior Circuit Judge, and LEVENTHAL, Circuit Judge.
 LEVENTHAL, Circuit Judge:
 
 
 1
 The Cities of Lafayette and Plaquemine, Louisiana ("Cities") petition this court to review orders of the Federal Power Commission and the Securities and Exchange Commission which approved applications, presented to the Securities and Exchange Commission by Louisiana Power and Light Company ("LP&L"), and to the Federal Power Commission by Gulf States Utilities Company, proposing issuance of bonds, notes, and stock to finance capital requirements. The gist of petitioners' complaint is that the agencies failed to take proper account of their claims that the proceeds would be used for the Companies' unlawful conspiracy to suppress competition. We affirm as to the orders of the Securities & Exchange Commission, and remand as to the order of the Federal Power Commission.
 
 I. BACKGROUND
 A. Pertinent Statutes
 
 2
 The Public Utility Act of 1935, passed August 26, 1935, 49 Stat. 803, contains, in Title I, the Public Utility Holding Company Act, 15 U.S.C. Sec. 79 et seq., which provides for regulation of public utility holding companies and is administered by the SEC. Its Title II enacted the Federal Power Act, Parts II and III, 16 U.S.C. Sec. 824 et seq. with provisions, for regulation of electric utility companies engaged in interstate commerce, administered by the FPC.
 
 Holding Company Act
 
 3
 Sections 6 and 7 of the Holding Company Act give the SEC jurisdiction over sales of securities by holding companies and their subsidiaries, subject to certain exceptions, notably an exemption in Sec. 6(b) for issues approved by state commissions.[1]
 
 
 4
 Section 6 forbids the sale of a security by a holding company or its subsidiary, unless the sale is in accordance with a declaration it has filed under Sec. 7, and with an order of the SEC permitting such declaration to become effective.
 
 
 5
 Under Sec. 7 the SEC may not permit a declaration to become effective unless it finds compliance with certain requirements. One of these requirements, set forth in Sec. 7(c) (2), is satisfied if the Commission finds "(2) such security is to be issued or sold solely * * * (B) for the purpose of financing the business of the declarant as a public utility company * * *." If the requirements of Secs. 7(c) and (g)[2] are met, Sec. 7(d) requires that the SEC "shall permit a declaration * * * to become effective unless [it] finds that- * * * (6) the terms and conditions of the issue or sale of the security are detrimental to the public interest or the interest of investors or consumers."
 
 
 6
 Finally, Sec. 7(f) provides that the Commission's order permitting a declaration to become effective "may contain such terms and conditions as the Commission finds necessary to assure compliance with the conditions specified in this section ."
 
 Federal Power Act
 
 7
 Section 204 of the Federal Power Act, 16 U.S.C. Sec. 824c, relates to the issuance of a security by a public utility,-defined by Sec. 201 as a company transmitting electric energy in interstate commerce or selling electric energy at wholesale in interstate commerce. Section 204(a) provides that no such public utility shall issue any security except as authorized by FPC order. It continues:
 
 
 8
 The Commission shall make such order only if it finds that such issue * * * (a) is for some lawful object, within the corporate purposes of the applicant and compatible with the public interest, which is necessary or appropriate for or consistent with the proper performance by the applicant of service as a public utility and which will not impair its ability to perform that service, and (b) is reasonably necessary or appropriate for such purposes.
 
 
 9
 Subsection (b) of Sec. 204 gives the Commission broad authorization to place conditions on the granting of an application, and specifically contemplates provisions "as to the particular purposes, uses, and extent to which * * * any security * * * or the proceeds thereof may be applied * * *."[3]
 
 
 10
 Subsection (f) of Sec. 204 establishes an exclusion as to a utility organized and operating in a state under the laws of which its security issues are regulated by a State commission.
 
 B. Petitioners' Antitrust Allegations
 
 11
 Louisiana Power and Light is a wholly-owned subsidiary of Middle South Utilities, Inc., a holding company registered under the Holding Company Act. It is engaged, as is Gulf States and Central Louisiana Electric Company (CLECO) (the three companies together being sometimes referred to as "Companies"), in generating, transmitting and selling electricity at wholesale and retail in Louisiana. Gulf States also does this in Texas. The three Companies are interconnected, engage in sales and exchanges of electricity among themselves, and are members of the eleven "South Central Electric Companies" which engage in a seasonal exchange of energy with the Tennessee Valley Authority. The Companies are owners in Louisiana of major transmission facilities, handling voltages up to 500 KV.
 
 
 12
 Petitioners allege that these three Companies engaged in a conspiracy to suppress and defeat an interconnection and pooling agreement between the Cities, Dow Chemical Company and Louisiana Electric Cooperative, Inc. ("LEC"). LEC, a generation and transmission cooperative financed by the Rural Electrification Administration, is made up of twelve electric distribution cooperatives, all of which operate in Louisiana.
 
 
 13
 In September 1964, the REA undertook to make a $56.5 million loan to LEC for construction of a 200 MW generating station with 1611 miles of transmission lines through which the LEC could serve eight of its twelve member cooperatives. Prior to this time, the three Companies had been selling power to these cooperatives. According to petitioners, the Companies succeeded in delaying the actual use of the funds thus provided for more than five years, through a series of lawsuits filed by the Companies themselves and by the Companies' attorneys on behalf of other putative plaintiffs.
 
 
 14
 Petitioners allege that in August, 1968, the Cities, Dow and LEC executed an Interconnection and Pooling Agreement providing for the interconnection of their generating systems and a long term pooling and coordination arrangement, with a minimum term of ten years. The agreement, approved by the REA administrator on November 19, 1968, provided for a combined planning of load requirements for the Cities, the LEC members and Dow. It meant, according to petitioners, assurance of a market for all surplus capacity and secondary energy, as well as coordination, and substantial savings, in the construction of new generators, in sum, economies of scale, plus benefits in the form of back-up for each system and energy interchanges.
 
 
 15
 Petitioners state that by engaging in frivolous and repetitive litigation, and by mounting a public relations drive and lobbying effort against LEC, the three Companies were able to hold up disbursement of the loan money until January, 1969, when a new REA administrator was sworn into office. This prevented the members of the new pool from going ahead with their agreement. Furthermore, a rise in costs during the five-year delay raised a serious question whether the original loan would suffice to finance all of the LEC's generation and transmission needs. Therefore, the new Administrator advanced funds only for the LEC generating station, but not for transmission lines, and LEC was left to negotiate with the three companies for use of their transmission lines.
 
 
 16
 Petitioners contend that the conspiracy continued during these negotiations. They say that the Companies, while willing to supply transmission of power to some of the LEC members, refused to supply transmission services between pool members. They further say that the Companies demanded that LEC limit its power capacity to the 200 MW already planned, and that the Companies supply all further power needs of the twelve cooperatives, thus precluding further LEC expansion to serve its members' expanding load.
 
 C. Agency Proceedings
 1. Securities and Exchange Commission
 
 17
 Case No. 24,764: On September 16, 1970, LP&L filed with the SEC a declaration for authority to issue and sell $20 million of first mortgage bonds and $7 million in preferred stock. The stated purpose of this financing was to enable LP&L to repay short-term borrowings it had made as temporary financing for its 1970 construction program, and for other corporate purposes.
 
 
 18
 On October 9, 1970, counsel for the Cities submitted a letter to the Commission, setting forth the allegations outlined above. The Cities asked the Commission to order an investigation of these matters by its staff, to consult with the staff of the FPC, and to withhold action on the authorization pending the results of the investigation or at least a conference with the parties. The Cities contended in their letter that the funds, if approved, would be utilized for the construction of facilities that would assist LP&L and its associates in their unlawful objectives, and asked that such approval, if granted, be conditioned on cessation of these activities and the establishment of a program to remedy the damage already done. The Cities requested that the matter be set down for hearing unless LP&L's parent agreed to such a condition. The Cities also requested a conference with the Commission and the Companies.
 
 
 19
 On October 27, 1970, the Commission issued its order stating that the Cities had not filed a Notice of Appearance as a party pursuant to Rule 9(a) of its Rules of Practice, or requested a hearing. The order further stated that "this controversy does not justify withholding of the requested order since it is not relevant to the consideration of the proposed transactions which in all respects satisfy the standards of Section 7."
 
 
 20
 Case No. 24,963: On November 2, 1970, LP&L filed with the SEC a declaration for authority to issue and sell up to $40 million of short-term notes, during the period through December, 1972. The stated purpose of these borrowings was to finance the construction of new facilities and improvements, and for other corporate purposes.
 
 
 21
 On November 30, 1970, petitioners filed with the SEC a formal "Protest and Intervention," which contained substantially the same allegations as the October 9 letter, and further requested that the Cities be made parties to the proceeding and that the SEC hold hearings.
 
 
 22
 On December 29, 1970, the SEC issued its Order permitting the declaration to become effective. The SEC found that the Cities did not directly attack the proposed use of proceeds or the terms and conditions of the proposed securities, but were simply maintaining "that authorization for the proposed financing enhances Louisiana's financial position to pursue the alleged violations of the antitrust laws." The SEC held that its authority under Section 7(d) (6) of the Act, to impose terms and conditions, related solely to the terms and conditions of the security to be issued, and "does not extend to the resolution of collateral and unrelated controversies in which a declarant may be engaged with other parties." The SEC concluded that the allegations in the Protest did not present issues relevant to Section 7 and therefore did not justify withholding the requested Order.
 
 
 23
 The SEC made findings in each proceeding "that it is appropriate in the public interest and in the interest of investors and consumers" that the declaration be permitted to become effective. It permitted both declarations to become effective without a hearing, and the security sales authorized were promptly completed.
 
 2. Federal Power Commission
 
 24
 Case No. 71-1041: On October 12, 1970, Gulf States filed an application with the FPC to sell $30 million of first mortgage bonds at competitive bidding. The application stated that the proceeds would be used to pay off part of Gulf States' commercial paper and short-term notes. On October 16, 1970, the FPC noticed the application and announced that protests or petitions to intervene should be filed on or before November 2, 1970.
 
 
 25
 On November 2, the Cities filed their protest and petition to intervene with the Commission. The protest set forth the allegations outlined above, claiming that Gulf States had violated the antitrust laws, the Federal Power Act, and the Holding Company Act. The Cities requested that the application be set down for hearing unless, as a condition to receiving approval for the sale of its securities, Gulf States would agree to purge itself of these alleged violations and remedy the damage already done.
 
 
 26
 Following an answer by Gulf States, the Commission, on December 3, 1970, entered an order denying a hearing and authorizing Gulf States to issue the proposed bonds. The Commission stated that the Cities' allegations were "irrelevant to a requested authorization of securities," and further found that:
 
 
 27
 The proposed issuance and sale of Bonds, as hereinafter authorized, will be for a lawful object, within the corporate purposes of Applicant and compatible with the public interest, which is appropriate for and consistent with the proper performance by Applicant or service as a public utility and which will not impair its ability to perform that service, and is reasonably necessary and appropriate for such purposes.[4]
 
 
 28
 The FPC refused the Cities' request for a hearing stating:
 
 
 29
 The requested approval of the issuance of the Bonds allows the Company only to change the form of a portion of its outstanding indebtedness, it does not call for the initiation of any construction or other program by the Company which might effect [sic] the interest of the Petitioners. The alleged violations which petitioners attempt to raise in this proceeding are irrelevant to a requested authorization of securities. There is no relief that the Commission can order in authorizing the issuance of the Bonds for refinancing purposes that would have any effect on the interest of the Petitioners, or solve any of the problems outlined by them.
 
 
 30
 In the petition for rehearing, filed December 16, 1970, the Cities argued that the Commission could not have known the purpose for which the bond proceeds would be used, because Gulf States had stated only that they would be added to the Company's general funds, to be used as part of interim funds for construction. Furthermore, the Cities argued, it was unclear whether the Commission considered their antitrust allegations irrelevant to a Section 204 determination generally, or only because, in this particular case, a refunding rather than new funding was involved. The Cities again urged that the Commission condition its approval to assure that the bond proceeds "would not be used to the detriment of the Cities or in a manner inimical to the proposed pool." The Commission denied rehearing, stating that the Cities' grounds for rehearing presented no facts or legal principles warranting any change in its orders.
 
 II. PROCEDURAL PROBLEMS
 
 31
 Before proceeding to the substantive issues involved in this case, we note that intervenors LP&L and Gulf States contend petitioners are not properly before this court. Neither the SEC nor the FPC suggest any procedural obstacle to the petitions.
 
 
 32
 We find no merit in intervenors' procedural contention. LP&L's initial contention[5] is essentially grounded in a claim of failure to exhaust administrative remedies. While the Cities may not have followed SEC procedures to the letter, they made plain their objections and the Commission ruled on the merits. We see no impediment to judicial review. Joseph v. FCC, 131 U.S.App.D.C. 207, 404 F.2d 207 (1968).
 
 
 33
 Intervenors contend that the Cities are not aggrieved by the actions of the SEC and FPC, and therefore may not seek judicial review of their orders, either under the review provisions of the particular agency statutes,[6] or under the general review provisions of the Administrative Procedure Act.[7]
 
 
 34
 This contention must be rejected on the authority of Association of Data Processing Service Organization, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), and Barlow v. Collins, 397 U.S. 159 (1970). The petitioners have alleged injury in fact resulting from the Commission's failure to consider their antitrust contentions relevant. The interest asserted by the petitioners arguably falls within the zone of interests to be protected by the statutes. There is a non-frivolous claim that the "public interest" requirements of these statutes requires consideration of antitrust conspiracy.[8] Even assuming petitioners' contentions should be rejected on the merits, they raised an arguable claim of right under the relevant statutes that establishes procedural standing.
 
 III. VALIDITY OF THE ORDERS
 
 35
 The orders of the FPC and SEC are accompanied by conclusory findings that approval of the applications is in the "public interest." The issue is whether these orders are valid in view of the refusal of these agencies to order a hearing on the allegations of intervening parties of the anti-competitive purpose and consequence of each application and its approval by the Federal agency involved.
 
 
 36
 The regulatory library includes a host of decisions establishing that when an agency is called upon to determine whether a proposal or condition satisfies the "public interest," or another similar broad standard, the agency has the authority and typically the responsibility to consider a challenge based on the asserted anti-competitive purpose or consequence of the proposal.[9]
 
 
 37
 This generality is not necessarily conclusive. The same statutory phrase may have different meanings in different contexts, and the statutes, agencies and court decisions are not necessarily fungible. A particular statute may have such a setting that, on consideration of its legislative history, the nature of the agency, and breadth of responsibility involved, and other material factors, a court may come to the conclusion that though its public interest language is broad its meaning in context warrants a relatively restricted reading.[10]
 
 
 38
 However it is a fair consensus of the cases cited that the nation's profound and pervasive devotion to competition as a fundamental economic policy, and conviction that the public interest is disadvantaged when private enterprises are permitted to engage in anti-competitive agreements and restraints, is applicable at least presumptively even in the case of monopolies or quasi-monopolies characterized by various degrees of government control and protection, subject of course to offset or rebuttal on analysis by the cognizant agency.
 
 
 39
 With these general observations as a point of departure, we consider the orders and statutes before us.
 
 Federal Power Commission Order
 
 40
 Since Gulf States is an electric utility company engaged in interstate commerce, subject to regulation under Title II of the Federal Power Act, its proposal to sell $30 million of first mortgage bonds required an application by the company, and approval by the FPC, under Sec. 204 of the Federal Power Act. Section 204 of the Federal Power Act is almost identical with the pertinent provisions of Sec. 20a of the Interstate Commerce Act, as amended, 49 U.S.C. Sec. 20a, which was recently given an authoritative reading in Denver & Rio Grande Western R. Co. v. United States, 387 U.S. 485, 87 S.Ct. 1754, 18 L.Ed.2d 905 (1967).
 
 
 41
 In Denver & Rio Grande the Court was concerned with an application of Railway Express Agency to sell shares equal to 20% of its outstanding stock to Greyhound Corporation. On a finding of urgent need the ICC authorized this issuance without a hearing, and deferred decision of contentions presented by objectors that the proposal was not in the "public interest" or for a "lawful object" because it would result in "control" of the applicant by the carrier purchasing the shares, with "anti-competitive" consequences.
 
 
 42
 The Court rejected the Government's contention "that Sec. 20a was designed to accomplish only the limited objective of protecting stockholders and the public from fiscal manipulation * * *."[11] The Court held that the ICC had erred in entering its approval while deferring consideration of the anti-competitive effects of the transaction, and remanded to the ICC for further proceedings. It set forth in unmistakable terms the authority and responsibility of the ICC to consider the "anti-competitive" issues. See 387 U.S. at 492, 87 S.Ct. at 1759:
 
 
 43
 We do not agree that Congress limited ICC consideration under Sec. 20a to an inquiry into fiscal manipulation. Even if Congress' primary concern was to prevent such manipulation, the broad terms "public interest" and "lawful object" negate the existence of a mandate to the ICC to close its eyes to facts indicating that the transaction may exceed limitations imposed by other relevant laws. Common sense and sound administrative policy point to the conclusion that such broad statutory standards require at least some degree of consideration of control and anticompetitive consequences when suggested by the circumstances surrounding a particular transaction. Both the ICC and this Court have read terms such as "public interest" broadly, to require consideration of all important consequences including anticompetitive effects.
 
 
 44
 The FPC observes that in another passage the Court said that the ICC was not required to hold a hearing in every case. That language merits exposition. See 387 U.S. at 498, 87 S.Ct. at 1762:
 
 
 45
 We conclude, therefore, that the ICC is required, as a general rule, under its duty to determine that the proposed transaction is in the "public interest" and for a "lawful object," to consider the control and anti-competitive consequences before approving stock issuances under Sec. 20a(2). This does not mean the ICC must grant a hearing in every case, or that it may never defer consideration of issues which arise when special circumstances are present. But it does mean that, when the ICC exercises its discretion to approve issuances without first considering important control and competition issues, the reviewing court must closely scrutinize its action in light of the ICC's statutory obligations to protect the public interest and to enforce the antitrust laws. Whether or not an abuse of discretion is present must ultimately depend upon the transaction approved, its possible consequences, and any justifications for the deferral.
 
 
 46
 In this passage the Court plainly earmarked the ICC's authority to omit a hearing on anticompetitive issues or to defer consideration thereof in cases presenting special circumstances-as an authority that required agency "justification" and close scrutiny by the reviewing court to assure against any abuse of discretion or default in statutory obligation.
 
 
 47
 The action of the FPC in the order before us is plainly inconsistent with its duties as developed in Denver & Rio Grande. The FPC contends to us that Sec. 204 does not require the FPC to consider antitrust allegations when authorizing the issuance of securities. We are cited to Pacific Power & Light Co., 27 FPC 623 (1962), and urged to show deference to the interpretation given a statute by the agency charged with its administration.[12] In the Pacific Power & Light proceeding the FPC was concerned with an application to issue "first mortgage bonds and common stock to use a portion of the proceeds to build a transmission line from Oregon to California at a higher voltage than would be presently required." The FPC noted that it had not been given certificate jurisdiction and "concluded that Section 204 could not be used as a vehicle for 'comprehensive licensing-type regulation * * *.' 27 FPC at 626. In the Commission's view, the plain purpose of Section 204 was 'to prevent the issuance of securities which might impair the company's financial integrity or its ability to perform its public utility responsibilities.' Ibid."
 
 
 48
 We are not called upon to review the FPC's decision in Pacific Power & Light, or to take account of the points raised in Commissioner Morgan's vigorous dissent. The FPC's 1962 ruling came prior to the Supreme Court's 1967 decision in Denver & Rio Grande, a point that merits particular emphasis since the FPC itself stressed that Sec. 204(a) was "copied almost verbatim from Section 20a of the Interstate Commerce Act" (27 F.P.C. at 627), and relied on the proposition that the purpose of Sec. 20a was to ensure a sound railroad credit structure.[13] But of course the Court's Denver and Rio Grande opinion establishes that while sound financial credit was the dominant objective of Sec. 20a of the Interstate Commerce Act, the breadth of the "public interest" criterion extends to the anticompetitive issues. Thus the FPC's own 1962 reasoning that its law tracks the ICC's statute undercuts the survival of its broad conclusion that Sec. 204(a) is limited to financial matters.[14]
 
 
 49
 The same may be said for the FPC's conclusion that its authority is necessarily limited since an interstate electric utility may issue short-term notes without FPC authority pursuant to Sec. 204(e) of the Federal Power Act,[15] and could launch its construction with those funds. The same might have been said as to the ICC, which has even less authority over short-term notes than the FPC.[16] The short answer is that a utility would be improvident indeed if it relied on its short-term authority to obviate agency overview on application for approval of the long term securities.
 
 
 50
 The Pacific Power & Light ruling stated that the FPC lacks authority to certificate a utility's operation or expansion. This has some weight, but not enough. It would have more if the FPC were in the same position as the SEC, of having no regulatory authority over operations of the utility. But the FPC does have authority over interstate electric utilities, and that authority is by no means insubstantial. As was rightly said in its most recently available annual report, the FPC "exercises national responsibility for the regulation of the interstate electric power industry. * * *"[17]
 
 
 51
 Apart from regulating interstate electrict utilities in regard to their issuance of securities, the FPC is mandated under the Federal Power Act to regulate their charges for the interstate transmission of electric energy (Sec. 206), and their mergers or consolidations (Sec. 203).
 
 
 52
 Significantly the FPC has been given authority and responsibility by Sec. 202 of the Act, 16 U.S.C. Sec. 824a, in regard to interconnection and coordination of facilities.
 
 
 53
 "For the purpose of assuring an abundant supply of electric energy throughout the United States with the greatest possible economy and with regard to the proper utilization and conservation of national resources," Sec. 202(a) directed the FPC "to divide the country into regional districts for the voluntary interconnection and coordination of facilities for the generation, transmission, and sale of electric energy" and pronounced it the "duty of the Commission to promote and encourage such interconnection and coordination within each such district and between such districts."
 
 
 54
 Section 202(b) gives mandatory authority to the FPC, upon application of any State commission or of any person engaged in the transmission or sale of electric energy, to order an interstate electric utility "to establish physical connection of its transmission facilities with the facilities of one or more other persons engaged in the transmission or sale of electric energy, to sell energy to or exchange energy with such persons." This authority exists if the FPC makes a finding that its exercise is in the public interest, subject only to the proviso that the interconnection not require the regulated utility to enlarge its generating facilities or impair its existing services.
 
 
 55
 In view of the FPC's broad public interest charter to enhance optimum interconnection and interchange of electric energy, not to mention its array of other activities in furtherance of electric energy capability,[18] the circumstance that its jurisdiction has not been extended to certificating responsibility is no reason for limiting it under Sec. 204 to a tunnel vision of the public interest.
 
 
 56
 At oral argument the Commission's General Counsel put it that the FPC is interested in safeguarding costs, rates and reliability, but it wants to stay out of the fight between investor-owned utilities on the one hand and cooperatives and municipalities on the other. Whether or not this is tactical wisdom, it may not be achieved at the expense of abdicating responsibility. And we see no reason why the responsibility of considering the public interest requires any jeopardy of the kind of objectivity that is contemplated for an independent regulatory commission.
 
 
 57
 The Commission is expected to make determinations as to the public interest in matters where there is such underlying conflict. Its docket contains a number of complaints by public utilities and by cooperatives against private companies, both for physical interconnection and for termination of charges attacked as discriminatory or otherwise unlawful.[19] It is illuminating that only recently the Supreme Court sustained an FPC interconnection order that rejected the claim of a private utility to make an interconnection with a municipally-owned utility on terms more onerous that those required of other investor-owned utilities.[20]
 
 Replacement of Short-Term Notes
 
 58
 The FPC's counsel vigorously urged an alternative contention, that the Cities' intervention did not require a hearing since their allegations concerning Gulf States' operations could have no meaningful relation to an application that only sought to replace short-term notes with long term bonds.
 
 
 59
 This contention is not without appeal, and also not without problems. First, the order giving Gulf States authority to issue $30 million bonds to replace short term notes apparently operated to give Gulf States authority to increase its overall debt, since it would have had authority forthwith to issue an additional $30 million in short-term notes.[21] It is not clear whether FPC counsel would have urged the same contention if the outstanding short-term notes had been of one year's duration and had been issued by Gulf States, pursuant to Sec. 204(e) of the Act, on its own authority and without an FPC order. A contention this broadly put would raise most serious questions.
 
 
 60
 The ultimate reason, however, for rejecting this contention of FPC counsel is that the cryptic statement of the FPC does not permit us to conclude with reasonable confidence that this was the position taken by the FPC. And we cannot permit arguments of counsel to take the place of agency findings.[22]
 
 
 61
 Our problem is not a merely technical one. The point here urged by counsel has significance only on the assumption that at another time the FPC would consider the anticompetitive issues as material. But that assumption means a modification or restriction of the FPC's 1962 ruling in Pacific Power & Light, supra. We have no guidance from the FPC that it accepted a limitation of that ruling. Indeed we have been asked to affirm its order on the reasoning of that 1962 ruling. Moreover when the Cities, in their petition for rehearing, expressly requested the FPC to advise whether the reason for denial of a hearing was the nature of the application as seeking approval for long-term bonds on a refunding of short term notes, the FPC declined to say this.
 
 
 62
 We do not consider what ruling we would make on the basis of such a position if thought through and embodied in FPC policy and findings. It suffices for present purposes to say that the FPC's terse and cryptic statement did not comply with the requirement we see in Denver & Rio Grande, that the agency's reason for denying or deferring hearing of anticompetitive issues be clear on the record, meaningful in findings or discussion.
 
 
 63
 Accordingly we deem it necessary to remand the order under review. To avoid misunderstanding, we think it appropriate to say expressly that an agency is not required to hold hearings in matters where the ultimate decision will not be enhanced or assisted by the receipt of evidence.[23] And as to interventions raising anti-competitive issues we see no objection in law to a disposition without hearing that is accompanied by an explanation, supported in the record, that the intervenor's contentions are too insubstantial or barren to indicate the existence of substantial anticompetitive issues, or to meet the requirement of a reasonable nexus between the activities challenged and the activities furthered by the application.[24]
 
 
 64
 We do not undertake to determine now what is involved in the requirement of reasonable nexus, which we think is fairly implied in the jurisprudence. Development of this requirement must await consideration in the first instance by the agency involved, and an analysis of the factual context.
 
 
 65
 We are aware too, of the pertinence of the comment of FPC's counsel, that security issues to provide funds for a utility's construction must be decided in a time frame much more limited than that often contemplated for antitrust litigation. But the doctrine of public interest consideration does not contemplate that an agency will be engaged in a determination of antitrust issues as such.[25]
 
 
 66
 In the context of a particular matter, it may become evident that the agency may approve forthwith a large portion of the application, and the use of the funds contemplated thereby, while reserving decision on the difficult issue. Indeed even an entire application may be approved if the agency stands ready to proceed with hearing and consideration of the anticompetitive issues, and to take the problems into account in the disposition of another application projected for presentation to the agency within a reasonable time.[26]
 
 
 67
 So far as antitrust issues are concerned the agency has the opportunity to obtain the comments of the Department of Justice.[27] It may even, indeed, defer its disposition pending determination of relevant court litigation where that will aid in the determination of the "public interest" issue. This would be in effect a reverse application of the doctrine of primary jurisdiction, a doctrine that has been appropriately referred to as supple and flexible.[28] The doctrine of primary jurisdiction "has become one of the key judicial switches" in furtherance of "coordination between judicial machinery and [administrative] agencies" in matters of mutual concern.[29] Switches operate both ways, and, depending on the nature of the issue, an agency may wait for a court as well as the reverse.
 
 
 68
 We have been at pains to set forth the latitude available to the agency in approach and procedure to obviate any concern that this court seeks to interfere with its exercise of discretion. What the court does require is that the agency take a "hard look" at problem areas.[30]
 
 Securities and Exchange Commission
 
 69
 Section 7(d) (6) of the Holding Company Act is not written in the same terms as Sec. 204 of the Federal Power Act. The SEC, in holding petitioners' antitrust allegations irrelevant to its determination, and refusing to set the matter down for hearing, stated:[31]
 
 
 70
 The phrase "terms and conditions" as here used relates solely to the terms and conditions of the security to be issued, and therefore, the phrase "detrimental to the public interest" refers to such terms and conditions and not to extraneous matters. Section 7(f) provides that "any order permitting a declaration to become effective may contain such terms and conditions as the Commission finds necessary to assure compliance with the conditions specified in this section." Authorization to impose terms and conditions under Section 7(f) does not extend to the resolution of collateral and unrelated controversies in which a declarant may be engaged with other parties. See Alabama Power Co., (Holding Company Act Release No. 15252, June 1, 1965), affirmed, Alabama Electric Cooperative, Inc. v. SEC [122 U.S.App.D.C. 367], 353 F.2d 905 (1965), cert. denied, 383 U.S. 968 [86 S.Ct. 1273, 16 L.Ed.2d 309].
 
 
 71
 We turn first to the precedent cited by the SEC. In Alabama Electric Cooperative v. SEC, 122 U.S.App.D.C. 367, 353 F.2d 905 (1965), Alabama Power, seeking to issue $14 million of common stock, claimed an exemption from SEC supervision under Sec. 6(b) of the Holding Company Act, on the ground that the issue was subject to regulation by a state commission. The Cooperative objected that the holding company intended to use the proceeds of this sale so as to duplicate its lines and facilities, and asked the SEC to prevent such use, through its power to impose conditions on an exemption "in the public interest or for the protection of investors or consumers." When the SEC refused, the Cooperative argued it had erred in refusing to consider the claim of anticompetitive effect. We affirmed the Commission, saying (122 U.S.App.D.C. at 369, 353 F.2d at 907):
 
 
 72
 The purpose of the Public Utility Holding Company Act * * * was to supplement state regulation-not to supplant it. Nowhere in the Act is there a provision granting to the SEC the sort of regulatory power attributed to it by the petitioner. Indeed, the congressional choice of that Commission to administer the Act is, in itself, the strongest sort of proof that the general purpose of the Act was to regulate the issuance of securities which could not be reached by state commissions.
 
 
 73
 In Municipal Electric Ass'n of Massachusetts v. SEC, 134 U.S.App.D.C. 145, 413 F.2d 1052 (1969), however, this court required the SEC to consider anticompetitive effects. That case involved an application by several New England electric utilities, under Sec. 10 of the Holding Company Act, 15 U.S.C. Sec. 79j, to approve their acquiring the stock of two nuclear-power electric generating companies. The Municipals sought a hearing on their charge that any approval of the acquisition, to the exclusion of the Municipals' opportunity to obtain power directly from the nuclearpower plants, would not be in the public or consumer interest, since it would deprive the Municipals of access to a source of cheap power and thus harm them competitively. The SEC denied the request for a hearing, holding that the Municipals had presented no issue of fact relevant to the proceedings. We reversed, and remanded for a hearing before the SEC concerning the imposition of appropriate conditions on the transaction.
 
 
 74
 Petitioners claim that both our action and opinion in Municipal establish the necessity of considering antitrust allegations before granting approvals to stock issues under Secs. 6 and 7. However, the Municipal opinion expressly asserts that a line, albeit a "fine line," is to be drawn between SEC's approval of an acquisition of stock by a utility, and a sale of securities by a utility. Acquisitions are governed by Secs. 9 and 10 of the Holding Company Act. Our Municipal opinion pointed out that Sec. 10, unlike Sec. 7, expressly prohibits approval of a transaction if the Commission finds that it will tend toward interlocking relations or the concentration of control of public-utility companies, of a kind or to an extent detrimental to the public interest or the interest of investors or consumers.
 
 
 75
 The Alabama Cooperative case is not to be read as limiting SEC's consideration under Sec. 7(d) (6) solely to reviewing the financial terms of the security to be issued. The force of that 1965 opinion is weakened, apart from the 1967 opinion in Denver & Rio Grande, by its erroneous assumption of the narrow reading to be given to Sec. 10, an assumption undercut by our 1969 opinion in Municipal. Moreover, Alabama Cooperative did not involve an SEC approval in the course of exercising its jurisdiction under Secs. 6 and 7, but the question whether it could impose terms to qualify the exemption provided by Sec. 6(b) for security issues approved by a state commission. In Municipal Elec. Ass'n of Mass. v. SEC, 136 U.S.App.D.C. 175, 419 F.2d 757 (1969), we specifically reserved the issue of whether antitrust considerations are included in the public interest referred to in approvals of Secs. 6 and 7.
 
 
 76
 We think proper resolution of the problem now before us is provided by the affirmance of the SEC's order, but with modification in part of our discussion in Alabama Cooperative. Where an agency has some regulatory jurisdiction over operations, it must consider whether there is a reasonable nexus between the matters subject to its surveillance and those under attack on anticompetitive grounds. But the general doctrine requiring an agency to take account of antitrust considerations does not extend to a case like the one before us where the antitrust problem arises out of operations of the regulated company (past and projected) and the agency, here the SEC, has not been given any regulatory jurisdiction over operations of the company. The SEC has no jurisdiction over operations and stands in a different posture from the FPC which, as we have already noted, has regulatory jurisdiction over operations in view of its authority, inter alia, to direct utilities to interconnect on reasonable terms, or to prohibit a utility from discriminating in rates and facilities against its municipal customers.
 
 
 77
 In Municipals the utility's acquisition of stock was subject to SEC jurisdiction. And the court held that the exercise of the authority to approve acquisitions requires consideration of antitrust matters, particularly in view of the statutory purpose to avoid undue concentration of control in public utility holding companies. This is a more static issue than direct surveillance of operations. It is rather a review of proposed structure to ascertain whether it embraces a substantial possibility of undue concentration of control. Of course a decision on structure requires "economic forecasting" concerning operations, in such matters as e. g., profitability, consequence of independence of management. SEC v. New England Elec. System, 390 U.S. 207, 211, 88 S.Ct. 916, 19 L.Ed.2d 1042 et seq. (1968). Yet although the matters are interrelated, the SEC's jurisdiction relates to structure rather than directly to operations.
 
 
 78
 To avoid misunderstanding, we are not here accepting the contention of SEC counsel that the distinction lies between application under Sec. 10 for acquisition, which requires consideration of antitrust issues, and applications under Sec. 6 for approval of security issues, which do not. As to applications under Sec. 6 the question left open by second Municipals is still open. So far as this opinion is concerned the court will be free to determine, if the circumstances warrant, that the application under Sec. 6 requires consideration of antitrust issues because the purpose of the application is significantly related to the structural position of the applicant in the industry-perhaps by a proposal for operating affiliation as well as one for capital affiliation-which presents the kind of issue, of undue concentration of control, that lies within the regulatory jurisdiction of SEC upon consideration of an application under Sec. 10.
 
 
 79
 There may also be circumstances where a particular proposed operating use of funds will, it is claimed, be linked significantly to operations within the SEC surveillance contemplated by Congress. Suppose it were objected that the utility planned a covert use of a significant part of the proceeds of a security issue to establish a political slush fund prohibited by Sec. 12(h) of the Holding Company Act. We think the SEC would be under a duty to give consideration to the claim, for the matter challenged is within the reasonable contemplation of Congress as one in which the SEC has a sphere of interest, and should explore further when the issue is brought to its attention.
 
 
 80
 Addressing ourselves broadly, however, to the question of sale of securities, and taking into account the regulatory volumes involved[32] and the lack of any SEC authority to regulate operations of utilities, we think an objecting intervenor cannot require SEC consideration of the applicant's operating activities from the point of view of undue restraints on competitors or potential competitors. We state this doctrine in terms of broad application rather than in categorical terms, for we leave open the resolution appropriate if in a particular case the operations assailed are of such a nature as to be equivalent, in significance and consequence, to structural affiliation, or if the purpose of the utility's sale of securities is otherwise shown to have a reasonable nexus to matters within the SEC's jurisdiction under other provisions. Within the broad reach of the doctrine we deem applicable we do not think petitioners have made a showing of reversible error.
 
 
 81
 In Nos. 24,764 and 24,963, the orders of the SEC are affirmed. In No. 71-1041, the cause is remanded to the FPC for further proceedings not inconsistent with this opinion.
 
 
 82
 So ordered.
 
 
 
 [1]
 Section 6 is codified as 15 U.S.C. Sec. 79f. Section 7 is codified as 15 U.S.C. Sec. 79g. Section 6(b) provides that if a particular security issue of a subsidary has been expressly authorized by the appropriate state utility commission, the SEC shall exempt the issue "subject to such terms and conditions as it deems appropriate in the public interest or for the protection of investors or consumers * * *."
 
 
 [2]
 Sec. 7(g) prohibits a declaration from becoming effective if the Commission has been informed by a State commission having jurisdiction over a company's issuance of securities, or alteration of rights of security holders, that State laws applicable thereto have not been complied with
 
 
 [3]
 "(b) The Commission, after opportunity for hearing, may grant any application under this section in whole or in part, and with such modifications and upon such terms and conditions as it may find necessary or appropriate, and may from time to time, after opportunity for hearing and for good cause shown, make such supplemental orders in the premises as it may find necessary or appropriate, and may by any such supplemental order modify the provisions of any previous order as to the particular purposes, uses, and extent to which, or the conditions under which, any security so theretofore authorized or the proceeds thereof may be applied, subject always to the requirements of subsection (a) of this section."
 
 
 [4]
 By amendment filed December 9, 1970, Gulf States advised the Commission of the terms it proposed to accept in the financing. The Commission approved these terms by an order filed the same day, and again stated that the proposed bonds were for a lawful purpose, and their issuance compatible with the public interest
 
 
 [5]
 LP&L argues that in case 24,764 Cities failed to file a notice of appearance or formally request a hearing, and this amounted to a failure to urge its objections before the Commission, which precludes judicial review under Sec. 24(a) of the Holding Company Act, 15 U.S.C. Sec. 79x(a)
 
 
 [6]
 Section 24(a) of the Holding Company Act, 15 U.S.C. Sec. 79x(a) provides judicial review for any "person or party aggrieved by an order issued by the Commission under this title * * *." Section 313(b) of the Federal Power Act, 16 U.S.C. Sec. 825l(b) provides judicial review for any "party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding * * *."
 
 
 [7]
 Section 10 of the Administrative Procedure Act, 5 U.S.C. Sec. 702, grants judicial review to a "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute."
 
 
 [8]
 Northern Natural Gas Co. v. FPC, 130 U.S.App.D.C. 220, 319 F.2d 953 (1968); City of Pittsburgh v. FPC, 99 U.S.App.D.C. 113, 237 F.2d 741 (1956)
 
 
 [9]
 FMC v. Aktiebolaget Svenska Amerika Linien, 390 U.S. 238, 242-246, 88 S.Ct. 1005, 19 L.Ed.2d 1071 (1968); Denver & Rio Grande Western R. Co. v. United States, 387 U.S. 485, 87 S.Ct. 1754, 18 L.Ed.2d 905 (1967); United States v. El Paso Natural Gas Co., 376 U.S. 651, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964); United States v. Philadelphia National Bank, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963); California v. FPC, 369 U.S. 482, 484-485 (1962); United States v. Radio Corporation of America, 358 U.S. 334, 79 S.Ct. 457, 3 L.Ed.2d 354 (1959); McLean Trucking Co. v. United States, 321 U.S. 67, 64 S.Ct. 370, 88 L.Ed. 544 (1944); Marine Space Enclosures, Inc. v. FMC, 137 U.S.App.D.C. 9, 17 ff, 420 F.2d 577, 585 (1969); Municipal Elec. Ass'n of Mass. v. SEC, 134 U.S.App.D.C. 145, 413 F.2d 1052 (1969); Northern Natural Gas Co. v. FPC, 130 U.S.App.D.C. 220, 226, 399 F.2d 953, 959 (1968); City of Pittsburgh v. FPC, 99 U.S.App.D.C. 113, 237 F.2d 741 (1956)
 
 
 [10]
 Alabama Electric Cooperative, Inc. v. SEC, 122 U.S.App.D.C. 367, 353 F.2d 905 (1965), cert. denied, 383 U.S. 968, 86 S.Ct. 1273, 16 L.Ed.2d 309 (1966); Alabama Electric Cooperative, Inc. v. SEC, 359 F.2d 434 (5th Cir. 1966)
 
 
 [11]
 See 397 U.S. at 491-492, 87 S.Ct. at 1759
 
 
 [12]
 Udall v. Tallman, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965)
 
 
 [13]
 Citing Sharfman, Interstate Commerce Commission, 190 (N.Y.1931)
 
 
 [14]
 The FPC noted that the Senate Committee "stressed" that control over capitalization is an essential means of safeguarding the public against unsound financial practices, see S.Rep.No.621, 74th Cong., 1st Sess. (1935) p. 50. But this Senate Report in no way negatives Justice Brennan's comment in Denver & Rio Grande that this dominant concern is not exclusive
 
 
 [15]
 Under Sec. 204(e), 16 U.S.C. Sec. 824c(e), the FPC is not given authority as to notes of less than a year's maturity aggregating less than 5% of the company's outstanding securities
 
 
 [16]
 Under Sec. 20a(9) of the Interstate Commerce Act, 49 U.S.C. Sec. 20a(9), the authority of the ICC does not extend to notes of two years or less duration not exceeding 5% of outstanding securities
 
 
 [17]
 1970 Annual Report, FPC, p. 24
 
 
 [18]
 The 1970 Annual Report discusses, inter alia, its Electric Power Reliability Policy; adoption in pursuance thereof, of "a system of comprehensive reporting by all segments of the electric power industry (private, public, cooperative and Federal) of information on operating data and advance planning by power pools, coordinating groups, and individual utilities and on studies to support such plans"; its 1970 National Power Survey; and the work of its Task Force on Environment
 
 
 [19]
 Annual Report for 1970, Table 10, p. 26
 
 
 [20]
 Gainesville Utilities Department et al. v. Florida Power Corp., 402 U.S. 515, 91 S.Ct. 1592, 29 L.Ed.2d 74 (1971). The FPC rejected the claim of Florida Power Corporation that the city system pay not only the capital cost of the interconnection but also an annual payment for the backup service. It noted among other matters that Florida Power had not included a comparable charge in any of the contracts for interconnection voluntarily negotiated with members of the Florida Operating Committee, an informal group coordinating the technical operations of five Florida utilities
 
 
 [21]
 Its previously granted authority to issue $80 million short term notes would not have been terminated, though the duration of the notes authorized would have been reduced by the lapse of time
 
 
 [22]
 Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962); Public Serv. Comm. of the State of New York v. FPC, 141 U.S.App.D.C. 174, 436 F.2d 904 (1970); WAIT Radio v. FCC, 135 U.S.App.D.C. 317, 418 F.2d 1153 (1969); Braniff Airways, Inc. v. CAB, 126 U.S.App.D.C. 399, 379 F.2d 453 (1967)
 
 
 [23]
 Denver Union Stock Yard Co. v. Producers Livestock Marketing Ass'n, 356 U.S. 282, 287, 78 S.Ct. 738, 2 L.Ed.2d 771 (1958); Citizens for Allegan County, Inc. v. FPC, 134 U.S.App.D.C. 229, 414 F.2d 1125 (1969)
 
 
 [24]
 In Municipal Elec. Ass'n of Mass. v. SEC, 134 U.S.App.D.C. 145, 152, 413 F.2d 1052, 1059 (1969), the court noted that the control challenged by the cities "is tied in significant manner to the acquisition of the stock" for which approval was sought
 
 
 [25]
 Northern Natural Gas Co. v. FPC, supra, note 9, 130 U.S.App.D.C. at 229-230, 399 F.2d at 962-963
 
 
 [26]
 Even in courts the doctrine of mootness does not apply to questions of a recurring nature. Southern Pacific Terminal Co. v. ICC, 219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310 (1911); Friend v. United States, 128 U.S.App.D.C. 323, 388 F.2d 579 (1967)
 
 
 [27]
 Northern Natural Gas Co. v. FPC, supra, 130 U.S.App.D.C. at 227, 399 F.2d at 960. Intervenor observes that Sec. 314(a) of the Federal Power Act does not set forth a duty in the FPC to report antitrust violations to the Attorney General such as appeared in Sec. 20(a) of the Natural Gas Act of 1938. If this is more than an accident of drafting style, perhaps marking the change between 1935 and 1938, it does not limit the authority of the agency either to refer matters to the Attorney General or to entertain his presentations
 
 
 [28]
 J. M. Huber Corp. v. Denman, 367 F.2d 104, 111 (5th Cir. 1966)
 
 
 [29]
 Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic, 400 U.S. 62, 68-69, 91 S.Ct. 203, 27 L.Ed.2d 203 (1970); Brawner Building, Inc. v. Shehyn, 143 U.S.App.D.C. 125, 442 F.2d 847 (1971). Compare United States v. Morgan, 307 U.S. 183, 191, 59 S.Ct. 795, 83 L.Ed. 1211 (1939)
 
 
 [30]
 Greater Boston Television Corp. v. FCC, 143 U.S.App.D.C. 383, at p. 393, 444 F.2d 841, at p. 851 (1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971); WAIT Radio v. FCC, 135 U.S.App.D.C. 317, 418 F.2d 1153 (1969)
 
 
 [31]
 JA 160, Holding Company Act Release No. 16955
 
 
 [32]
 In fiscal 1970, 15 active registered holding companies and their subsidiaries sold 59 issues, pursuant to SEC authorization, and raised new capital in the amount of $1,684,000,000. SEC 36th Ann.Report (for 1970) p. 164