**CITY OF LAFAYETTE, LOUISIANA,**
and
**City of Plaquemine, Louisiana,**
**Petitioners,**

v.

**SECURITIES AND EXCHANGE COM-MISSION, Respondent;**

**Middle South Utilities, Inc., Intervenor.**

**No. 71–1337.**

United States Court of Appeals,
District of Columbia Circuit.

Argued March 10, 1972.

Decided June 29, 1973.

Denis McInerney, New York City,
with whom Daniel James, New York

City, was on the brief, for intervenor. Donald J. Mulvihill, Washington, D. C., also entered an appearance for intervenor. -

Robert C. McDiarmid, Washington, D. C., with whom George Spiegel, Washington, D. C., was on the brief, for petitioners.

David Ferber, Solicitor, S. E. C., with whom Solomon Freedman and Aaron Levy, Attys., Div. of Corporate Regulation, S. E. C., were on the brief for respondent.

Before BAZELON, Chief Judge, and McGOWAN and LEVENTHAL, Circuit Judges.

LEVENTHAL, Circuit Judge:

The Cities of Lafayette and Plaquemine, Louisiana, ("Cities") seek review of two orders of the Securities and Exchange Commission entered in the course of an acquisition proceeding under section 10(b)(1) of the Public Utility Holding Company Act of 1935, 15 U. S.C. § 79j(b)(1). We postponed disposition pending guidance from the Supreme Court in its review of our opinion in City of Lafayette v. SEC & FPC, 147 U.S.App.D.C. 98, 454 F.2d 941 (1971). The Supreme Court's opinion appears under the name Gulf States Utilities Co. v. FPC, 411 U.S. 747, 93 S.Ct. 1870, 36 L. Ed.2d 635 (1973). Finding no error in the Commission's conduct of the proceeding, we deny the petition for review.

A. *Background of the Proceedings*

The factual context of the underlying dispute was canvassed in our opinion in City of Lafayette v. SEC & FPC, *supra*, disposing of a related proceeding.

Briefly, on May 19, 1969, intervenor Middle South Utilities, Inc. ("Middle South"), a registered holding company with subsidiaries in Arkansas, Mississippi and Louisiana, applied to the SEC for permission to acquire the Arkansas-Missouri Power Company ("Ark-Mo"), a smaller utility operating in Arkansas and Missouri. On June 25, 1969, the SEC published notices of hearings on Middle South's proposal, directing any person desiring to be heard or proposing to intervene in the proceeding to file a written request to that effect, as provided in Rule 9(a) of the Commission's Rules of Practice, 17 C.F.R. § 201.9(a). The hearings were held in August 1969. Noone appeared in opposition to Middle South's application. At the close of the hearing, the parties—Middle South and the Commission's Division of Corporate Regulation—waived an initial decision by the hearing examiner; and Middle South consented to participation by the Division in the preparation of the Commission's findings and opinion. On several occasions after the hearing, pursuant to stipulation between Middle South and the Division, the record was reopened for the limited purpose of incorporating certain additional exhibits and memoranda from Middle South that had been requested.

A decision on the acquisition was still pending on October 9, 1970, some fourteen months later, when the Cities submitted a letter to the SEC alleging that a Middle South subsidiary, Louisiana Power and Light ("LP&L"), had been a party, with two other privately owned utility companies, to a conspiracy to lessen competition in the areas served by the three companies.[1] They asked the SEC to investigate the allegations and to hold up the Middle South/Ark-Mo acquisition pending the outcome of the investigation. The Cities argued that the acquisition would increase Middle South's—and therefore LP&L's—predatory capacity in its dealings with the Cities. On November 16, 1970, the Cities filed formal notices of appearance under SEC Rule 9(a), which provides for intervention by an interested municipality or other political subdivision of a state upon the filing of a written notice

---

1. The specifics of the allegations can be found in City of Lafayette v. SEC & FPC, *supra*, 147 U.S.App.D.C. at 101–102, 454 F.2d at 944–945.

of appearance.[2] Both Middle South and the Division of Corporate Regulation opposed the attempt to intervene.

On March 30, 1971, the SEC issued an "Order Denying Intervention and Request for Reopening of Hearing" that granted Middle South's motion to dismiss the Cities' notices of appearance as "untimely filed," Holding Company Act Release No. 17081 (J.A. at 273). On May 5, 1971, the Commission released its findings and opinion approving the acquisition.

### B. The Cities' Request for Intervention

On this appeal, the Cities assert first that the SEC erred in denying their intervention and second that in passing on the anti-trust aspect of the acquisition it improperly failed to consider relevant anti-competitive behavior on the part of Middle South's subsidiary, called to the Commission's attention by the Cities' submissions.[3]

The gist of the Cities' intervention claim is that SEC Rule 9(a) does not by its terms establish a time limit for intervention by political entities included within its terms, "as opposed to other persons, who must intervene 'not later than 2 days prior to the date fixed for the commencement of the hearing,'" citing SEC Rule 9(c), 17 CFR § 201.9(c). The SEC concluded that, notwithstanding the lack of a specific time limit for intervention by cities, the regulation

> cannot be deemed to grant, nor can an
> orderly administration of proceedings

permit, an extension of that privilege for such a long period of time beyond the time fixed in the public notice of hearing for interested parties to request participation.

Public Utility Holding Company Act Release No. 17081, at 2. The Cities make no claim that their late start resulted from inadequate SEC notice procedures.[4] It is arguable that the SEC should at least formally have granted the Cities' request for intervention; but the matter is of no consequence, since the SEC committed no error in refusing the Cities' request to reopen the hearing to receive new evidence.

### C. The Anti-trust Issues

The Cities' anti-trust laws issues are founded on § 10(b)(1) of the 1935 Act, which contemplates that SEC approval of an acquisition of stock or assets of a utility by a registered holding company will be withheld if the Commission finds that the acquisition

> will tend towards interlocking relations or the concentration of control of public-utility companies, of a kind or to an extent detrimental to the public interest or the interest of investors or consumers.

██ It is not disputed that the SEC must take account of anti-competitive potential before it can approve acquisition under § 10(b)(1). Our decision in Municipal Electric Ass'n v. SEC, 134 U.S.App.D.C. 145, 413 F.2d 1052 (1969), requires consideration of a range of

---

2. Rule 9(a), 17 C.F.R. § 201.9(a), provides:
   > (a) *Who may become parties; interested division a party.* Any interested representative, agency, authority or instrumentality of the United States or any interested State, State commission, municipality or other political subdivision of a State shall become a party to any proceeding upon the filing of a written notice of appearance therein. The interested division of the Commission shall be deemed a party to all proceedings.

3. Intervenor additionally contends the Cities lack standing to challenge the ac-

quisition. Similar arguments were rejected in our earlier opinion, 147 U.S. App.D.C. at 104–105, 454 F.2d at 947–948. The Cities satisfy the standing requirement by alleging injury in fact and a non-frivolous claim that the 1935 Act requires consideration of the Cities' contentions in an acquisition proceeding. *See*, Association of Data Processing Serv. Organizations v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).

4. Notice for the hearing in this case was included in an SEC release that went to all those on the Commission's mailing list and was published in the Federal Register.

anti-trust policies in making § 10(b)(1) determinations; "violations of the anti-trust laws bear upon 'the public interest or the interest of investors or consumers,' terms used on Section 10(b)(1)," 134 U.S.App.D.C. at 150, 413 F.2d at 1057. The Commission must go further than investigation of simple market shares in its "concentration of control" analysis. *Municipal* established the relevance of effect on individual competitors to concentration-of-control determinations and requires the SEC to consider allegations that an acquisition would threaten concentration of control by cutting competitors off from low cost power supplies that would otherwise be available from the company to be acquired. In *Municipal,* there was no showing of *per se* undue concentration resulting from the acquisition. It was enough that competition might be impaired through reduction of economic viability of individual competitors.

The Cities allege a variety of anti-competitive activities by LP&L and its privately-owned collaborators. They contend that by collusive negotiating tactics, these companies sought to force the Louisiana Electric Co-operative, Inc. ("LEC") to cease its dealings with the Cities so as to defeat a proposed inter-connection among LEC, the Cities and the Dow Chemical Company; that by those same tactics, the Companies sought to force LEC to purchase all its incremental power needs from the Companies; and finally that the Companies are actively engaged in a course of conduct in Louisiana aimed at achieving a monopoly of the available transmission facilities and services and a monopoly of the generation and sales to all electric co-operatives too large to be served by LEC's present capacity.

The Cities say that the anti-competitive activity attributable to Middle South through its ownership of LP&L in its present sphere of operations is relevant to a determination of whether or not to authorize it to extend its operations into new territory; that the SEC improperly contented itself with analysis of possible "concentration of control" that did not take account of the likelihood that not only would the acquisition of Ark-Mo entrench Middle South's predatory capabilities in its present areas, but also would permit extension of its predatory behavior into new territroy.

Although the SEC denied the Cities intervention, it recognized its obligation under § 10(b)(1) to "consider the proposed acquisition in the light of federal anti-trust policies" (J.A. 280). Its decision approving the acquisition found that it would result in "at most a minimal increase" in the "overall size" of Middle South. Furthermore, the acquisition would not "significantly affect" Middle South's "relative position" either in its present operating areas or in those into which it would be introduced by acquisition of Ark-Mo.

As to the Cities' specific allegations of prior anti-competitive behavior by Middle-South's subsidiary, the intervenors and the Commission answer that the possibility that *alleged* anti-competitive tactics will be introduced into Ark-Mo's territory is "mere conjecture," (SEC Br. at 22) and in any event was raised for the first time on appeal. They emphasize that the concentration of control that will result from the proposed acquisition is quite small—Ark-Mo's consolidated assets will add approximately 3% to those of Middle South. Since the "concentration effect" of the acquisition will be only "de minimus" in Ark-Mo's territory, the nature of the anti-trust claims of the Cities "has at best only a tenuous relationship to the acquisition" (SEC Br. at 19) and cannot be thought to threaten the Cities in southern Louisiana, some 350 miles away.

We need not consider whether the SEC would have been justified in refusing evidence timely offered as to the issues raised by the Cities. Here, the first tentative effort to inject them into the proceedings came some 14 months following the close of the hearing held by the SEC. When the administrative

process is far advanced in a particular case, a party seeking to present new evidence in support of new contentions must at a minimum show likelihood that consideration of the new material will cause a change in the agency's decision.

■ The Cities have made no such showing here. We agree with the Commission that the nexus between the conduct complained of—LP&L's activities in southern Louisiana—and the acquisition itself is not altogether clear.[5] The 3% increase in Middle-South's consolidated assets provided by the Ark-Mo acquisition is hardly a significant increment in predatory capacity against the Cities, hundreds of miles distant. The Cities say it is possible that Middle South's allegedly anti-competitive proclivities will be introduced in Ark-Mo's territory following the acquisition. But we do not find error in the SEC's characterization of that aspect of the case as too conjectural to warrant a late proffer, particularly when none of the competitors operating in areas adjacent to Ark-Mo's territory were concerned enough to oppose the acquisition.

■ It is also material that the conduct complained of by the Cities relates to the operations of LP&L. As we pointed out in our earlier *City of Lafayette* opinion, *supra,* the principal thrust of the SEC mandate under the 1935 Act concerns industry structure rather than individual companies' operations.[6] Evidence of an acquiring company's operations might well be material, when time-

ly presented in a proper case, to the issue of projected structure. But here the offer of proof came late, and its direct thrust pertains to considerations not the principal focus of the 1935 Act. We think there is room for a judgment that the congressional scheme for protecting the public interest in acquisition proceedings is not offended when long-delayed objections that relate to operations are subordinated to the goal of an expeditious conclusion to extended administrative proceedings. It is not unfair in the circumstances before us to remit the Cities to the alternative forums that exist for ventilating the issues they raise. Although the acquisition of Ark-Mo will itself be immune from subsequent challenge under section 7 of the Clayton Act,[7] the activities of LP&L in Louisiana can form the basis for court actions by private plaintiffs, like the Cities, as well as by the Department of Justice. *Cf.,* Otter Tail Power Co. v. United States, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973).

■ The Cities invoke precedents, involving the Federal Power Commission, that an agency must reopen proceedings when confronted with material relevant to its statutory function.[8] We have considered them carefully and find they do not conflict with our result here. In the first place, several of the cited cases hinge on special factors that underscored the need for consideration of the matters raised, even though the proceedings were nearing completion.[9]

---

5. The transaction at issue in *Municipal* was one in which damage to competitors was an inherent feature of the acquisition because competitors of the acquiring company would have been cut off from low-cost nuclear power supplies. Here, competitive damage is at most a potential rather than an inevitable consequence of an increase in the predatory capacity of the Middle-South system.

6. *With* City of Lafayette v. SEC & FPC, *supra, compare* Municipal Electric Ass'n v. SEC, *supra.*

7. Section 7 of the Clayton Act, 15 U.S.C. § 18, provides that nothing therein shall apply to acquisitions approved by the SEC

in a proceeding under § 10 of the Public Utility Holding Company Act.

8. Udall v. FPC, 387 U.S. 428, 87 S.Ct. 1712, 18 L.Ed.2d 869 (1967); Scenic Hudson Preservation Conference v. FPC, 354 F.2d 608 (2d Cir., 1965) cert. denied, 384 U.S. 941, 86 S.Ct. 1462, 16 L.Ed. 2d 540 (1966); Michigan Consolidated Gas Co. v. FPC, 108 U.S.App.D.C. 409, 283 F.2d 204, cert. denied, 364 U.S. 913, 81 S.Ct. 276, 5 L.Ed.2d 227 (1960); City of Pittsburgh v. FPC, 99 U.S.App. D.C. 113, 237 F.2d 741 (1956).

9. In *Udall,* the Court noted that the Secretary of the Interior had under certain statutes "a special mandate from Con-

More generally, while those cases all involved review of operations, the FPC has considerably broader authority over the operations of the companies it regulates than has been lodged in the SEC. *See* City of Lafayette v. SEC, *supra*, affirmed, Gulf States Utilities Co. v. FPC, *supra*.

The Cities' petition for review is denied.

So ordered.

gress, a mandate that gives him a special standing to appear, to intervene, to introduce evidence on the proposed river redevelopment program, and to participate fully in the administrative proceedings." 387 U.S. at 439–440, 87 S.Ct. at 1718.

In *Scenic Hudson*, the Commission was under a specific statutory duty to consider all possible alternatives before granting a license under section 10(a) of the Federal Power Act, 16 U.S.C. § 803(a).

And in *Michigan Consolidated*, under the "special circumstances" of the case

the court determined that a party's proposed settlement raised "matters on their face" which "reflected a basis for an alternative . . . so apparently in the public interest that their consideration at some point in the proceedings was indispensable to the validity of any public interest determination" in support of the proposed application for total abandonment of a gas pipe line. 108 U.S.App.D.C. at 431, 283 F.2d at 226.