963 F.2d 1574
 295 U.S.App.D.C. 407, 1992-1 Trade Cases P 69,856
 MICHIGAN PUBLIC POWER AGENCY, et al., Petitioners,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Consumers Power Company, Palisades Generating Company, Intervenors.
MICHIGAN PUBLIC POWER AGENCY, et al., Petitioners,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Consumers Power Company, Palisades Generating Company, State
of Michigan and the Michigan Public Service
Commission, Intervenors.
MICHIGAN PUBLIC POWER AGENCY, Michigan South Central Power
Agency, Michigan Municipal Electric Association, Wolverine
Power Supply Cooperative, Inc., City of Bay City, City of
Charlevoix, Village of Chelsea, City of Eaton Rapids, Grand
Haven Board of Light and Power, City of Harbor Springs, City
of Hart, Holland Board of Public Works, Lansing Board of
Water and Light, City of Lowell, City of Petoskey, City of
Portland, City of St. Louis, Traverse City Board of Light
and Power, and City of Zeeland, Michigan, Petitioners,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Consumers Power Company, Intervenor.
 Nos. 90-1580, 91-1025 and 91-1173.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued March 10, 1992.
Decided May 29, 1992.
 
 Robert A. Jablon, with whom Thomas C. Trauger, Washington, D.C., was on the brief, for petitioners in 90-1580, 91-1025, and 91-1173. David B. Kolker, Washington, D.C., also entered an appearance for petitioners in 91-1025.
 Katherine Waldbauer, Atty., F.E.R.C., with whom William S. Scherman, Gen. Counsel, Jerome M. Feit, Sol., and Joseph S. Davies, Deputy Sol., Washington, D.C., were on the brief, for respondents in 90-1580, 91-1025, and 91-1173.
 William M. Lange, Washington, D.C., with whom Robert M. Neustifter, Jackson, Miss., and Renee Hamilton Gwaltney, for Consumers Power Co. and John T. Stough, Jr., Jane I. Ryan, and Andrew K. Soto, Washington, D.C., for Palisades Generating Co. were on the joint brief, for intervenors in 90-1580, 91-1025, and 91-1173.
 Don L. Keskey, Henry J. Boynton, and Frank J. Kelley, Lansing, Mich., entered appearances for intervenors the State of Mich. and the Michigan Public Service Com'n in 91-1025.
 Before: MIKVA, Chief Judge, SILBERMAN and WILLIAMS, Circuit Judges.
 Opinion for the court filed by Circuit Judge SILBERMAN.
 SILBERMAN, Circuit Judge:
 
 
 1
 The Michigan Municipal Cooperative Group petitions for review of three sets of orders by the Federal Energy Regulatory Commission (FERC) related to transactions involving intervenors Consumers Power Company and Palisades Generating Company.[1] In all three proceedings, the Commission rejected the Group's objection that the transaction at issue was likely to have anticompetitive consequences, explaining that the Group's allegations were too unfounded, premature, and irrelevant to warrant full investigation at a hearing. We think that FERC's decisions were well within its discretion to manage its proceedings, and for that reason we deny the petitions.
 
 I.
 A. The Underlying Dispute
 
 2
 Consumers Power Company is the largest electric utility in Michigan. A subsidiary of CMS Energy Corporation, an investor-owned holding company, Consumers owns more than four-fifths of the power generating capacity in its area and an even larger share of the "bulk" (high voltage) transmission lines that link generating units to each other and to power distributors in Michigan and adjoining states. Consumers has a double-faceted relationship with the members of the Michigan Municipal Cooperative Group, an association of publicly owned municipal and rural cooperative utilities (and smaller utility associations such as the Michigan Public Power Agency, the name petitioner herein). As power distributors in their various local regions, Group members are customers of Consumers, purchasing electricity at wholesale rates for resale; similarly, as owners of their own generating plants, Group members rely heavily on Consumers' transmission system to carry their excess capacity to each other and to other energy purchasers in the area. As power generators, however, Group members also compete with Consumers for wholesale and retail business.
 
 
 3
 In recent years the relationship has soured. The Group has taken the position that Consumers is engaged in an elaborate anticompetitive scheme designed to increase its profits at the expense of the Group members (and the Michigan public). The Group claims that Consumers is attempting to sell its generating assets to affiliated companies, shift the proceeds of [295 U.S.App.D.C. 409] these sales to its parent holding company (and beyond the reach of federal and state regulation), and then buy back the power the affiliates generate at above-cost rates (which are passed on to the Group members in Consumers' wholesale rates). It is alleged that Consumers is using its monopoly over transmission service to enforce the scheme, locking up markets by providing superior transmission access to its own and affiliated power generators while cutting off the Group's. The three transactions at issue in this case are, according to the Group, paradigmatic of Consumers' plot.
 
 
 4
 Transmission access, Consumers replies, has nothing to do with the Group's real grievance: Group members, in fact, have open access to the transmission grid through individual interconnection contracts and longstanding, FERC-approved rates, which the Group has not challenged as unreasonable or discriminatory. What underlies the Group's complaints, it is argued, is Consumers' refusal to allow Group members to obtain an ownership interest in the transmission system.[2] The Group's response has purportedly been "regulatory blackmail," a campaign of intervening in every FERC proceeding that involves Consumers with volumes of meritless and irrelevant accusations of anticompetitive behavior, in the hope that the resulting turmoil and delay will convince Consumers to relent and offer the Group partnership in the transmission business. Consumers contends that the three proceedings we review in this case are prime examples of the Group's illegitimate ambitions. FERC agreed.
 
 
 5
 B. The Facility Transfer and PPA Rate Proceedings
 
 
 6
 The first two proceedings are offshoots of a 1988 agreement between Consumers and Bechtel Corporation that partially settled lawsuits arising from Bechtel's construction of Consumers' now-abandoned Midland nuclear plant. Consumers agreed to transfer its Palisades nuclear plant and some related transmission facilities (principally a transformer and two half-mile lines connecting the plant to a substation on Consumers' transmission grid) to a new entity, the Palisades Generating Company (Palisades Genco), which would be owned four-ninths by Consumers, three-ninths by Bechtel, and two-ninths by other investors. The new company would then enter a long-term contract to sell the plant's energy output to Consumers at "incentive rates"--rates based primarily on projected costs, with a revenue multiplier to reward Palisades Genco if it operates the plant more efficiently (with Bechtel's help) than Consumers did in the past--rather than more traditional rates based on historic costs. Accordingly, Consumers and Palisades Genco executed an Asset Purchase Agreement and a 17-year Power Purchase Agreement (PPA) and then, pursuant to sections 203(a) and 205(c) of the Federal Power Act (FPA), 16 U.S.C. §§ 824b(a) and 824d(c), respectively, applied to FERC for approval of the transfer of transmission facilities and the PPA rates. The Group intervened in both proceedings.
 
 
 7
 FERC determined that an evidentiary hearing was necessary to decide how the transfer of facilities would affect Consumers' operating costs and rates, see Consumers Power Co. and Palisades Generating Co., 52 F.E.R.C. p 61,023, at 61,141 (1990) (Facility Transfer Order), rehearing denied, 52 F.E.R.C. p 61,382, at 62,343-46 (1990) (Facility Transfer Rehearing ), and to ensure that the amended PPA rates[3] were not "unjust, unreasonable, unduly [295 U.S.App.D.C. 410] discriminatory or preferential or otherwise unlawful," Palisades Generating Co., 52 F.E.R.C. p 61,264, at 61,978-79 (1990) (PPA Rate Order), rehearing denied in relevant part, 53 F.E.R.C. p 61,239, at 61,988 (1990) (PPA Rate Rehearing ). In both proceedings, however, the Commission refused to broaden the hearing to address the Group's allegations that the transactions were associated with anticompetitive activities by Consumers. FERC summarized its position on this point as follows:
 
 
 8
 In response to the Group's concerns about potential anticompetitive impacts of the proposed transfer, and its claimed entitlement to transmission and backup power services equivalent to those that might be offered to Palisades Genco in the future, the Commission found that there was no showing that the [Group] was refused transmission service over the facilities at issue; that general transmission access and discrimination issues were not ripe for investigation as there was no allegation of actual refusal to provide service or evidence of any discrimination; and that the proceeding was not the proper forum to investigate possible future violations of the FPA, as a complaint could be filed at the appropriate time.
 
 
 9
 Facility Transfer Rehearing, 53 F.E.R.C. at 62,342.
 
 
 10
 An extensive hearing was held by an Administrative Law Judge in early 1991. The ALJ has not yet issued his initial decision.
 
 C. The Securities Proceeding
 
 11
 In October 1990, in the midst of the dispute over the two Palisades transactions, Consumers applied to FERC (pursuant to section 204(a) of the FPA, 16 U.S.C. § 824c(a)) for authority to issue $900 million of short-term securities during 1991 and 1992. The application represented that Consumers would use the funds for typical business purposes: to finance facility construction and improvement, to refund other short-term debt and repurchase outstanding securities, to finance fuel inventories and meet other working capital requirements, and so on. The Group again intervened and again demanded that FERC investigate the charge that Consumers would use the funds to promote its anticompetitive scheme. The Commission saw no more merit in those allegations in this context than it had in its previous orders, concluding that "[t]he concerns of the Group pertain to matters that are: (1) within the jurisdiction of the Michigan [Public Service] Commission and Michigan state courts; (2) being addressed in other Commission proceedings; or (3) not ripe for consideration." Consumers Power Co., 53 F.E.R.C. p 61,444, at 62,567-68 (1990) (Securities Order), rehearing denied, 54 F.E.R.C. p 61,323, at 61,028-30 (1991) (Securities Rehearing ). Determining that Consumers' application satisfied the requirements of section 204(a), FERC approved it. See id. at 62,568.
 
 
 12
 The Group petitioned for review of each of the three sets of orders, and we consolidated the cases.
 
 II.
 
 13
 The Group contends that FERC has ignored its statutory obligation to inquire into the anticompetitive consequences of the three transactions involving Consumers. The Commission, supported by the intervenors, responds that its refusal to hold a hearing into the Group's unfounded, premature, and misdirected claims was entirely appropriate, and adds that we should not even address the merits of its decisions because the Group lacks standing and the PPA Rate and Facility Transfer orders are not yet final or ripe for judicial review. We unquestionably have jurisdiction over the securities transaction, and so we discuss it first.
 
 A. The Securities Proceeding
 
 14
 The Commission approved Consumers' issuance of the $900 million in securities without setting any issues for hearing or otherwise deferring or limiting action, so the Securities orders are, everyone agrees, [295 U.S.App.D.C. 411] final and ripe for review. Furthermore, we have held, without demurrer by the Supreme Court, that parties in circumstances very similar to the Group's--parties challenging "the Commission's failure to consider their antitrust contentions relevant" in approving a securities issuance--are "aggrieved" within the meaning of 16 U.S.C. § 825l (b) and therefore eligible to petition for judicial review. City of Lafayette, Louisiana v. SEC, 454 F.2d 941, 947-48 (D.C.Cir.1971), aff'd sub nom. Gulf States Utils. Co. v. FPC, 411 U.S. 747, 93 S.Ct. 1870, 36 L.Ed.2d 635 (1973); see also Associated Gas Distribs. v. FERC, 899 F.2d 1250, 1258-59 (D.C.Cir.1990). Our jurisdiction over this petition is thus clear.
 
 
 15
 Our review of the merits of the Group's claims is guided by the Supreme Court's decision in Gulf States Utilities Co. v. FPC, 411 U.S. 747, 93 S.Ct. 1870. In that case, FERC's predecessor, the Federal Power Commission (FPC), approved Gulf States' application to issue $30 million in long-term bonds under section 204(a), declining two intervenors' request for a formal hearing into their allegations that Gulf States would use the bonds to finance or refinance its anticompetitive interference with a power pool to which they belonged. See id. at 750-54, 93 S.Ct. at 1873-75. The Court rejected the Commission's argument that its statutory obligation to ensure that section 204(a) proposals are "for some lawful object ... and compatible with the public interest," 16 U.S.C. § 824c(a), does not extend to consideration of the "possible anticompetitive consequences flowing from the issuance of a security." 411 U.S. at 757, 93 S.Ct. at 1877. Examining the language and legislative history of section 204 and similar provisions of the FPA, and determining that the public interest is presumed to encompass the "fundamental national economic policy expressed in the antitrust laws," the Court held that the Commission's broad regulatory power under the FPA "clearly carries with it the responsibility to consider, in appropriate circumstances, the anticompetitive effects of regulated aspects of interstate utility operations." Id. at 756-59, 93 S.Ct. at 1876-78.
 
 
 16
 The Court then sought to define the circumstances in which summary disposition of such allegations would be "appropriate," explaining that its "conclusion that, as a general rule, the Commission must consider anticompetitive consequences of a security issue under § 204 does not mean that the Commission must hold a hearing on objections in every case." Id. at 762, 93 S.Ct. at 1879. Recognizing that "[s]o strict a rule would unduly limit the discretion the Commission must have in order to mold its procedures to the exigencies of the particular case," the Court reaffirmed the Commission's authority to decline to investigate claims that lack facial merit and to defer consideration of allegations in some instances. Id. (citing City of Lafayette, 454 F.2d at 953-54). The Court did, however, direct reviewing courts to " 'closely scrutinize' " such summary dispositions of anticompetitiveness objections, stating that " '[w]hether or not an abuse of discretion is present must ultimately depend on the transaction approved, its possible consequences, and any justifications for the deferral' or summary treatment." Id. 411 U.S. at 763, 93 S.Ct. at 1880 (quoting Denver & R.G.W.R. Co. v. United States, 387 U.S. 485, 498, 87 S.Ct. 1754, 1762, 18 L.Ed.2d 905 (1967)).
 
 
 17
 The Commission's order in Gulf States did not clearly indicate whether the Commission had in fact summarily rejected the intervenors' allegations on their particular merits (rather than under a blanket policy) and if so, why. The Court therefore was unable to "closely scrutinize" the Commission's action and was obligated to remand the case for development of a more complete record. See id. 411 U.S. at 763-64, 93 S.Ct. at 1880. The Court was careful, however, not to foreclose the possibility that the Commission could, on remand, decline a hearing into the intervenors' charges on the ground that they were entirely unrelated to the section 204 proceeding, noting that the City of Lafayette panel had indicated that "certain aspects of this argument are not without substantial appeal." Id. (citing 454 F.2d at 952).
 
 
 18
 Gulf States thus obliges us to review FERC's determinations under section 204 [295 U.S.App.D.C. 412] as we do most types of informal agency action. FERC cannot disregard factors that Congress intended it to consider (such as the potential anticompetitive effects of its actions), see, e.g., Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983), and we in turn must give FERC's determinations close scrutiny to ensure that they are adequately explained, see, e.g., id.; City of Lafayette, 454 F.2d at 954. Nevertheless, we must bear in mind the substantial deference we accord agencies in ordering their proceedings. See, e.g., Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., 435 U.S. 519, 543, 98 S.Ct. 1197, 1211, 55 L.Ed.2d 460 (1978); Kansas Power & Light Co. v. FERC, 851 F.2d 1479, 1484 (1988).
 
 
 19
 We think, after such scrutiny of the Securities orders, that the Commission's decision not to hold a hearing into the Group's allegations of anticompetitive consequences reflects an adequately explained and reasonable exercise of its discretion to manage its proceedings. FERC acted with full awareness of its responsibilities under Gulf States and has never maintained that it could ignore the substance of the Group's claims. See, e.g., Securities Rehearing, 54 F.E.R.C. at 62,029 n. 11. Rather, after considering the nature of the transaction and its potential impact on competitive conditions, FERC determined that launching an investigation into the Group's objections would be inappropriate and premature.
 
 
 20
 Importantly, FERC saw no direct or immediate relationship between the securities issuance and any anticompetitive acts by Consumers, past, present, or predicted. "[The Group] has not demonstrated that the anticompetitive activity will, indeed, occur as a result of this authorization." Id. at 62,028-29 (emphasis in original); see City of Lafayette, 454 F.2d at 953 (Commission may require intervenors to demonstrate "a reasonable nexus between the activities challenged and the activities furthered by the application"). No evidence was presented that Consumers has misused the proceeds from past securities offerings (including $800 million authorized for 1990), and Consumers would violate the FPA, see 16 U.S.C. § 824c(c), if it used the proceeds from this offering in any way inconsistent with the routine purposes set forth in its application (which parallel the purposes listed in its past proposals). Any misapplication of the funds to affect rates or to consummate a transaction could be challenged, the Commission observed, in the relevant FERC proceeding, and any unauthorized use at all may be attacked in a complaint proceeding. See Securities Order, 53 F.E.R.C. at 62,567-68 & n. 25; Securities Rehearing, 54 F.E.R.C. at 62,029.
 
 
 21
 The Commission also considered but rejected the Group's contentions that the securities issue was part and parcel of a general anticompetitive scheme of Consumers. In the earlier Facility Transfer and PPA Rate orders, FERC had determined that the Group's allegations regarding discriminatory transmission access were groundless and premature, as there was no indication that Consumers had either offered preferential transmission service to its affiliates or refused service to Group members. In fact, Group members have access to the transmission grid through both individual interconnection contracts, which Consumers stands willing to negotiate, and FERC-approved tariffs, which Consumers has offered to revise.[4] See Securities Order, 53 F.E.R.C. at 62,567 & n. 21 (citing previous orders). Moreover, the Group has never challenged the tariffs as "unduly discriminatory or preferential" under 16 U.S.C. § 824e(a), nor sued Consumers for violation of the antitrust laws, see Otter Tail Power Co. v. United States, 410 U.S. 366, 372, 93 S.Ct. 1022, 1027, 35 L.Ed.2d 359 (1973). As the Commission recognized, the Group really wants an ownership interest in the transmission system. But the Group made no showing that Consumers has any legal obligation to allow its competitors to become its partners. See, [295 U.S.App.D.C. 413] e.g., Facility Transfer Rehearing, 53 F.E.R.C. at 62,345.[5] The Group's claims, the Commission explained, became no more authentic, ripe, or relevant when repeated in the securities context. See Securities Order at 62,567-68 & n. 24.[6]
 
 
 22
 The general contention that Consumers would use the securities proceeds to promote its alleged scheme of manipulating assets to benefit its parent, CMS Energy Corporation, and escape regulation was also discounted by the Commission. The Group suggested that one element of this scheme was Consumers' effort to transfer about $1.5 billion in proceeds from the sale of its Midland plant, a proposal the Michigan Public Service Commission had blocked (for reasons having nothing to do with anticompetitive effects). See In re Consumers Power Co., 112 P.U.R.4th 241 (Mich. PSC 1990), aff'd sub nom. CMS Energy Corp. v. Attorney General, 190 Mich.App. 220, 475 N.W.2d 451 (1991), leave to appeal denied, 437 Mich. 918 (1991). Based only on a conclusory charge that the Midland transaction was anticompetitive, the Group asked FERC to deny the securities application and to direct Consumers to finance its business needs with the Midland proceeds. The Commission refused, explaining that on its face Consumers' application satisfied the section 204(a) criteria, including need for the funds; that FERC has no direct authority to require a utility to use specific existing assets rather than otherwise acceptable debt to finance cash requirements (and was unwilling to condition approval to achieve the same result indirectly); and that any FERC action premised on the Midland sale might interfere with the jurisdiction of the Michigan Commission and the Michigan courts. See Securities Order, 53 F.E.R.C. at 62,566-67; Securities Rehearing, 54 F.E.R.C. at 62,029; see also Northern Cal. Power Agency v. FPC, 514 F.2d 184, 189 (D.C.Cir.), cert. denied, 423 U.S. 863, 96 S.Ct. 122, 46 L.Ed.2d 92 (1975). In sum, FERC concluded, "the Group fails to demonstrate any nexus between this proceeding and alleged efforts to limit the regulatory review of Consumers' rates, or concerns about power sales and facilities transfers involving Consumers." Securities Order, 53 F.E.R.C. at 62,567.
 
 
 23
 In our view, this explanation sufficiently justifies FERC's summary disposition of the Group's objections. We see no grounds to require FERC to allocate its limited resources to full-fledged investigation of the Group's claims, which were primarily hypotheticals with no evident basis in fact or experience. Administrative agencies are afforded wide deference in predicting the likelihood of future events. See FCC v. National Citizens Comm. for Broadcasting, 436 U.S. 775, 813-14, 98 S.Ct. 2096, 2121, 56 L.Ed.2d 697 (1978). If the hypotheticals [295 U.S.App.D.C. 414] crystallize, and the Commission sidesteps its commitment to deal with actual or imminent misuse of the securities or their proceeds, the Group presumably would have an actionable grievance. See Southern Union Gas Co. v. FERC, 840 F.2d 964, 971-72 (D.C.Cir.1988). As of now, they do not.
 
 
 24
 Petitioners protest that approval of the Commission's actions in this case would eviscerate Gulf States. We disagree. Gulf States directs us to evaluate the nexus between the transaction at issue and its alleged anticompetitive consequences, and then to determine whether the Commission unreasonably neglected the connection. If Consumers' application presented an obviously direct and imminent anticompetitive risk--say, for example, if Consumers proposed to use the proceeds to acquire a major competitor--then FERC might well have been obliged to set a hearing. See Denver & R.G.W.R. Co., 387 U.S. at 501-07, 87 S.Ct. at 1763-66; see also Maryland People's Counsel v. FERC, 761 F.2d 768, 778 (D.C.Cir.1985) (FERC may not defer to future proceedings the investigation of an objection that "goes to the heart of the public interest determination immediately to be made"). But the Group's objections fall much closer to the other end of the spectrum, towards the proposition--suggested by petitioners, but flatly rejected by the Supreme Court--that intervenors should be able to obtain a full hearing in any FERC proceeding merely by uttering the word "anticompetitive."
 
 
 25
 Nevertheless, the Group contends that its allegations are much more "extensive" than those of the petitioners in Gulf States and since the Court remanded the Commission's order in that case, we must do the same here. To be sure, the Group fills hundreds of pages of the record with pleadings, but mere bulk does not make allegations logical, ripe, or relevant. The petitioners in Gulf States charged a routine antitrust violation, a conspiracy to destroy their power pool through frivolous litigation and lobbying and refusal to provide transmission access to and between pool members, see 411 U.S. at 752, 93 S.Ct. at 1874; we find nothing so straightforward and concrete in the Group's pleadings. More important, the Court in Gulf States did not, as we observed above, accept the argument that the petitioners' allegations must be addressed in a hearing; the Court instead hinted that the Commission could dispose of those allegations summarily as irrelevant to the securities proceeding, so long as it fully explained the basis for such a decision. See id. at 763-64, 93 S.Ct. at 1880-81. The Securities orders provide such a well-reasoned explanation.
 
 
 26
 B. The Facility Transfer and PPA Rate Proceedings
 
 
 27
 Here, we encounter a serious argument that the Facility Transfer and PPA Rate orders are not final agency action (or are not ripe for judicial review) because, while excluding investigation of the Group's anticompetitiveness allegations, FERC did not approve the transfer and tariff but rather submitted them to an ALJ for hearing on other issues.[7] When determining the ripeness of administrative action, we balance "the fitness of the issues for judicial decision" (with the finality of the agency's action being a prerequisite) and "the hardship to the parties of withholding court consideration." Abbott Laboratories v. Gardner, 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967); see also FTC v. Standard Oil Co. of Cal., 449 U.S. 232, 243, 101 S.Ct. 488, 494, (1980) (Socal ) (construing meaning of "final agency action" under the Administrative Procedure Act, 5 U.S.C. § 704); Papago Tribal Util. Auth. v. FERC, 628 F.2d 235, 239 (D.C.Cir.) (discussing finality under 16 U.S.C. § 825l (b)), cert. denied, 449 U.S. 1061, 101 S.Ct. 784, 66 L.Ed.2d 604 (1980).
 
 
 28
 If these two petitions had come before us independent of the Securities petition, it is not clear that we would think them either [295 U.S.App.D.C. 415] final or ripe.[8] Although the Commission has repeatedly and definitively stated its position on the Group's objections, making the anticompetitive consequences portions of the Facility Transfer and PPA Rate orders seem amenable to immediate review, the Commission's orders appear to have little if any direct and immediate impact on petitioners at this stage in the administrative proceedings. But we do not think that ordinary finality and ripeness considerations are controlling in the unusual circumstances of this case. We have already, in addressing the merits of the (unquestionably final and ripe)Securities orders, extensively discussed the analysis applicable to the other two petitions[9] and have applied that rule of law to a very similar set of facts. Indeed, the Gulf States standard is analytically very similar to the ripeness test--close nexus to anticompetitive effects overlaps with immediate impact, and the concerns for judicial meddling in agency discretion are closely aligned--so a decision put on ripeness grounds would coincide to a large extent with the Gulf States inquiry. Rather than leaving these petitions half-decided, then, we believe it appropriate under these extraordinary circumstances to address them on the merits.
 
 
 29
 The Facility Transfer and PPA Rate orders follow much the same pattern as the Securities orders and reach equally reasonable conclusions. The Group could point to no immediate or direct anticompetitive impact from the transfer of the Palisades transmission lines or from the PPA rates. The Group's allegations about discriminatory transmission access specifically related to Palisades Genco were entirely hypothetical. The Group did not claim that it had sought and been denied access (much less equal access) to the transmission facilities being transferred, nor that Palisades Genco had obtained any transmission service (much less preferential service) from Consumers. See, e.g., PPA Rate Rehearing, 53 F.E.R.C. at 61,988; Facility Transfer Order, 52 F.E.R.C. at 61,141 & n. 26. And it was unlikely that the Group would seek such access to the Palisades transmission lines, or that Palisades would seek to transmit energy to other customers on the Consumers' grid, in the near future, since the PPA binds Palisades to sell its entire energy output to Consumers until the year 2006.[10] Allegations of unfair access relating to Palisades Genco and its transmission facilities would be addressed, FERC averred, but only when they became more concrete. See, e.g., id. at 61,141.
 
 
 30
 As it did in the Securities orders, the Commission also refused to allow the Group to use the facility transfer and rate proceedings as a wedge to force investigation of its allegations concerning Consumers' overall activities. The Commission thought the Group's charges of discriminatory transmission service without substance, at least as currently presented, since the Group's demands focused on transmission ownership rather than access at reasonable and nondiscriminatory rates. See Facility Transfer Rehearing, 53 F.E.R.C. at 62,345. In its brief to us, the Group asserts that in addition to its demands for ownership, it also has offered to [295 U.S.App.D.C. 416] accept mere access if it is at rates "economically and functionally equivalent" to ownership. Despite the more than ample pleadings, we are unable to discern exactly what that means, how it differs from Consumers' existing (and pending) open-access tariff, and what right the Group has to such rates--or how we are to reconcile that assertion with the Group's representations elsewhere that "access is insufficient." Reply Br. at 9. We see nothing unreasonable in the Commission's answer to the Group's claims: if you do not like Consumers' tariffs, which have nothing directly to do with the proposals we are trying to evaluate here, then challenge them in a complaint proceeding. See Facility Transfer Order, 52 F.E.R.C. at 61,141.
 
 
 31
 Similarly rebuffed were the Group's efforts to link the facility transfer and PPA rates to Consumers' supposed asset-shifting scheme. The Group asked FERC to evaluate the competitive ramifications of the Consumers' transfer of the $525 million Palisades nuclear plant (as well as its $5 million transmission facilities), but FERC refused, pointing to its lack of jurisdiction over generating facilities, 16 U.S.C. § 824(b)(1), and to a concurrent desire not to interfere with the Michigan state authorities, who have and were exercising such jurisdiction. See Facility Transfer Rehearing, 53 F.E.R.C. at 62,343-44. The Group's argument went well beyond Gulf States, where the question was the potential anticompetitive use of the proceeds from the transaction before the Commission; the Group wanted FERC to evaluate the potential uses of the proceeds from a different transaction, one over which FERC does not even have jurisdiction. See id. at 62,344-45.
 
 
 32
 * * * * * *
 
 
 33
 FERC cannot, to be sure, shut its eyes to the potential anticompetitive consequences of its regulatory decisions, but it need not launch a full investigation just because a party cries "anticompetitive behavior." Whether allegations of anticompetitive impact are sufficiently concrete and sufficiently relevant to the proceeding at hand to warrant hearing is a determination left to the discretion of the Commission. FERC did not abuse that discretion in this case.
 
 
 34
 We have considered petitioners' other arguments and find them without merit. For the reasons stated, we deny the petitions for review.
 
 
 35
 It is so ordered.
 
 
 
 [1]
 The State of Michigan and the Michigan Public Service Commission also intervened in No. 91-1025 but filed no brief
 
 
 [2]
 As cost-based rates should in principle be virtually identical to the real costs of electricity incurred by a joint owner for the power it receives by virtue of its ownership interest, it is not clear what advantage would accrue to the Group from securing the interest it desires. Counsel for Consumers suggested at oral argument that the advantage was due to the tax-exempt status of the publicly owned entities making up the Group, but we find nothing in the record on the matter
 
 
 [3]
 In an order that is not under review, FERC accepted the original PPA rate proposal for filing and set a hearing to determine its lawfulness. See Palisades Generating Co., 48 F.E.R.C. p 61,144, at 61,575 (1989) (Original PPA Rate Order ). In April 1990 Palisades Genco filed a minor amendment to the PPA, and at that point the Group raised its allegations that the PPA had anticompetitive consequences. It is the Commission's actions in response to this amendment that we refer to herein as the "PPA Rate" orders
 
 
 [4]
 We are told that Consumers filed a new and even more liberal transmission tariff with FERC on February 27, 1992
 
 
 [5]
 The Group's claims display the rudiments of an "essential facility" theory of antitrust violation. See generally P. AREEDA & H. HOVENKAMP, ANTITRUST LAW p 736.1-.2, at 784-832 (1991 Supp.). But despite ample opportunities, the Group has failed to articulate how its allegations satisfy the elements of this rather confused doctrine, see id. p 736.2a, at 806-07, and particularly why the doctrine might apply when a regulated monopolist freely offers its services at terms approved by the regulator and refuses only to sell an ownership interest to its competitors. See id. p 736.1b, at 787 ("[E]ven the most ardent interventionist does not usually claim that an individual monopoly should be required to sell an equity interest in itself to actual or would-be competitors."); cf. Otter Tail Power Co., 410 U.S. at 371-79, 93 S.Ct. at 1026-30 (affirming federal court's power to order interconnections at reasonable terms to remedy a monopolist's outright refusal to sell or transmit power)
 
 
 [6]
 The Commission did not specifically discuss the Group's most concrete allegation--that Consumers would use the securities proceeds in part to construct a new transmission line to Indiana in which it had offered to let an investor-owned utility (pursuant to an old agreement) but not Group members invest. The Commission's expressed rationale, however, clearly covers the matter: the Group's argument was framed in terms of a right to co-ownership, and any claim that Group members could not obtain access to the line was premature since the line had yet to be built. The Commission has since made this reasoning explicit in a proceeding directly related to the new line. See PSI Energy, Inc. and Consumers Power Co., 55 F.E.R.C. p 61,254, at 61,811 (1991), rehearing denied, 56 F.E.R.C. p 61,237, at 61,911-12 & n. 31 (1991). Petitions for review of the orders in that proceeding have been held in abeyance pending our decision in this case. See Michigan Municipal Cooperative Group v. FERC, No. 91-1388 (D.C.Cir. Dec. 5, 1991)
 
 
 [7]
 FERC and the intervenors also question the Group's standing to pursue these two petitions for review. We think that the Group members are aggrieved in essentially the same way by these decisions as by the Securities orders, and again rely on City of Lafayette, 454 F.2d at 947-48, to hold that petitioners have standing under 16 U.S.C. § 825l (b)
 
 
 [8]
 FERC left the hearing open to several issues that the Group seeks to raise before us involving potential self-dealing between Consumers and Palisades Genco and the legality of rates not based on historic costs and subject to annual FERC review. See, e.g., PPA Rate Rehearing, 53 F.E.R.C. at 61,988-89. Those issues are clearly not final and we do not address them further. See Papago, 628 F.2d at 239-40. We consider below only the portions of the Commission's orders dealing with the Group's anticompetitiveness charges
 
 
 [9]
 The Gulf States standard also governs the merits of the Facility Transfer and PPA Rate orders. See Gulf States, 411 U.S. at 758-59, 93 S.Ct. at 1877-78 (dicta); see also FPC v. Conway Corp., 426 U.S. 271, 279, 96 S.Ct. 1999, 2004, 48 L.Ed.2d 626 (1976)
 
 
 [10]
 Consumers did discuss providing transmission services to Palisades Genco in the settlement negotiations with Bechtel, and Consumers and Palisades Genco apparently either entered into or contemplated entering into a "Transmission Services Commitment Agreement." Original PPA Rate Order, 48 F.E.R.C. at 61,571 n. 3. FERC does not mention this agreement (which we cannot find in the joint appendix) in its later orders, perhaps because it was not in fact executed or was rendered irrelevant, at least in the near future, by the long-term output PPA